IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

OWNERS INSURANCE COMPANY,

     Plaintiff/Counter-Defendant,

v.                                                            No. 2:19-cv-02581-MSN-cgc

KW REAL ESTATE VENTURES, A
DIVISION OF KEMMONS WILSON,
INC.,

     Defendant/Counter-Plaintiff,

## ORDER DENYING PLAINTIFF/COUNTER-DEFENDANT OWNERS INSURANCE COMPANY'S MOTION FOR SUMMARY JUDGMENT

Before the Court is Plaintiff/Counter Defendant Owners Insurance Company's ("Owners" or "Plaintiff") Motion for Summary Judgment, (ECF No. 33) ("Motion"), filed on December 9, 2020.  Defendant/Counter Plaintiff KW Real Estate Ventures ("KW" or "Defendant") filed its Response on February 22, 2021.  (ECF No. 44.)  On March 4, 2021, Owners filed its Reply.  (ECF No. 47.)  For the reasons below, the Court **DENIES** Owners' Motion.

## BACKGROUND

This case exemplifies the cautionary tale that one cannot build a great building on a weak foundation.[1]  In the early 2000s, KW began to build condominium communities in the Memphis area to attract empty nesters.  (ECF No. 33-1 at PageID 369; ECF No. 45 at PageID 883.)   KW operated like a general contractor for these condominium projects.  (ECF No. 45 at PageID 883–

---

1.  The following facts are undisputed unless noted.

84; ECF No. 48 at PageID 913.)  Meaning, KW "hired contractors and subcontractors to perform all work necessary to prepare the site, execute the plans, and construct the finished homes." (*Id.*) KW, however, did not perform any actual construction work on these projects. (*Id.*)

Oaks at Parkview is one such project located in Olive Branch, Mississippi. (*Id.*)  KW broke ground on the project around 2005 and planned to construct several four-unit condominiums there. (*Id.*)  During construction, KW contracted with several companies to examine the site's soil conditions: Hall, Blake and Associates, Inc. ("HBA"), Fisher & Arnold, Inc. ("F&A"), and Acuff Enterprises, Inc. d/b/a Scott Contractors, Inc. ("Scott").[2] (*Id.* at PageID 913–14.)  HBA performed a "geotechnical investigation" into the project site "to define the general subsurface conditions[.]" (*Id.* at PageID 913; ECF No. 33-5 at PageID 402.)  F&A then developed the architectural and engineering plans for the site, considering the work done by HBA.[3]  (ECF No. 48 at PageID 914; ECF No. 44-16 at PageID 864.)  Finally, Scott excavated and graded the site to prepare it for vertical construction.  (ECF No. 33-4 at PageID 396; ECF No. 44-16 at PageID 864; ECF No. 45 at PageID 886.)  The earthwork for the project was complete by March 2007.  (ECF No. 48 at PageID 918.)  However, due to the 2008 recession, the condominium construction at issue here (Buildings 27 and 28) did not begin until 2015.  (ECF No. 44-16 at PageID 862; ECF No. 45 at PageID 887.)

When construction resumed on Buildings 27 and 28, KW contracted with Dave Moore Companies, LLC to complete the job.  (ECF No. 44-6 at PageID 765–66; ECF No. 44-14; ECF No. 45 at PageID 887.) Notably, KW "did not redo the work that had previously been completed

---

2.  While the parties dispute the exact functions these subcontractors performed, there is no dispute that they all generally were hired to perform jobs related to the earthwork.

3.  Owners disputes to what extent F&A incorporated **<u>all</u>** of HBA's work and findings. (ECF No. 48 at PageID 914.)

(including the earthwork and engineering)."  (ECF No. 44 at PageID 633; ECF No. 45 at PageID 887.)  Let it not be said that KW did nothing; in fact, KW hired Poe Engineering, Inc. to inspect the building pads where the concrete slabs for Buildings 27 and 28 would be poured.  (ECF No. 44 at PageID 633; ECF No. 44-3 at PageID 682.)  Poe Engineering, Inc.'s inspection found that "the foundation was supported on soil with sufficient bearing strength to support the design load." (*Id.*)  Poe Engineering, Inc. "made no subsoil investigation."  (*Id.*)

After nearly a decade, Buildings 27 and 28 were completed in 2016.  (ECF No. 45 at PageID 889.)  The individual units were then sold to buyers, with the first sale in September 2016 and the last in December 2016.  (ECF No. 48 at PageID 919.)  Shortly thereafter, the new owners began to complain that their units had "extensive cracks in walls, near windows, and in the floors and ceilings, racked doors, sloped and distorted flooring, separations around the window openings, wall joints, and between floors and baseboards."  (*Id.* at PageID 920.)  It was eventually determined that this damage arose from differential settlement that occurred in the soil beneath the buildings. (*Id.* at PageID 921.)

The parties generally agree that differential settlement caused the damage to Buildings 27 and 28.  (*Id.)*  That general agreement ends when it comes to who (or what) deserves blame for the damage.  (ECF No. 44 at PageID 636.)  Owners asserts that the differential settlement occurred because of "differential settlement of the various foundations and slabs-on-grade. . . [due to] long-term, ongoing consolidation of a relatively thick layer of loosely placed, poorly compacted backfill soils."  (ECF No. 33-10 at PageID 520; ECF No. 34 at PageID 579.)  Conversely, KW contends that a subcontractor caused the differential settlement.  (ECF No. 44 at PageID 636.)

Like most businesses, KW purchased insurance to protect itself from potential liability. KW procured two such commercial general liability insurance policies from Owners.[4]  Policy number 102319-03608596-15 ("2015 Policy") lasted from October 1, 2015, to October 1, 2016. (ECF No. 45 at PageID 888; ECF No. 48 at PageID 911.)  Policy number 102319-03608596-16 ("2016 Policy") applied from October 1, 2016, through October 1, 2017.  (ECF No. 45 at PageID 888–89; ECF No. 48 at PageID 911.)

KW filed an insurance claim concerning Buildings 27 and 28 in October 2018.  (ECF No. 44-15 at PageID 857.)[5]  Owners hired an outside firm, GHD, to investigate KW's claim.  (ECF No. 33-10.)  GHD's investigation determined that the damage to Buildings 27 and 28 was caused by "differential settlement of the various foundations and slabs-on-grade" due to "long-term, ongoing consolidation of a relatively thick layer of loosely placed, poorly compacted backfill soils."  (*Id.* at PageID 520.)  In other words, KW's subcontractors did not cause the settlement. (ECF No. 47 at PageID 908.)

Owners filed this suit to request that the Court declare coverage does not exist for the damage to Buildings 27 and 28 that occurred on August 28, 2019.  (ECF No. 1 at PageID 4–5.) Owners filed its present Motion on December 9, 2020.  (ECF No. 33.)  KW filed its Response on February 22, 2021.  (ECF No. 44.)  Owners then filed its reply on March 4, 2021.  (ECF No. 47.)

## STANDARD OF REVIEW

---

4.  The parties dispute whether two (2) separate insurance policies exist or KW merely renewed the prior policy.  (ECF No. 48 at PageID 911.)  Important to note, there has been no assertion that the policies contain differing language.  In other words, the insurance provisions relevant here share identical language.  For purposes of this Order, the Court refers to the 2016 policy.  (*See* ECF No. 33-8.)

5.  The claim listed October 1, 2016, as the date of loss.  (ECF No. 44-15 at PageID 857.)

Federal Rule of Civil Procedure 56 permits a party to move for summary judgment — and the Court to grant summary judgment — "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting the presence or absence of a genuine dispute of material fact must support its position either by "citing to particular parts of materials in the record," including depositions, documents, affidavits or declarations, stipulations, or other materials, or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). To decide a motion for summary judgment, courts must view the facts contained in the record and all inferences that can be drawn from those facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, to survive summary judgment, a plaintiff "must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 586. Courts may not weigh the evidence, judge the credibility of witnesses, or determine the truth of any matter in dispute. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The moving party bears the initial burden to show that no genuine dispute of material fact exists. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The moving party may discharge this burden either by producing evidence that demonstrates the absence of a genuine issue of material fact or simply "by 'showing'—that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. Where the movant has satisfied this burden, the nonmoving party cannot "rest upon its . . . pleadings, but rather must set forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009) (citing *Matsushita*, 475 U.S. at 586); Fed. R. Civ. P. 56. The

nonmoving party must present sufficient probative evidence to support its claim that disputed material facts remain that must be evaluated by a judge or jury at trial. *Anderson*, 477 U.S. at 248–49 (citing *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253 (1968)); *see also White v. Wyndham Vacation Ownership, Inc.*, 617 F.3d 472, 475–76 (6th Cir. 2010). A mere scintilla of evidence does not suffice; there must be evidence from which a jury could reasonably find in favor of the nonmoving party. *Anderson*, 477 U.S. at 252; *Moldowan*, 578 F.3d at 374.

A court's limited role is to determine whether there is a genuine dispute about a material fact; that is, if the evidence in the case "is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. This determination requires that the Court "view the evidence presented through the prism of the substantive evidentiary burden." *Id.* at 254. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Thus, if the plaintiff must ultimately prove its case at trial by a preponderance of the evidence, on a motion for summary judgment the Court must determine, based on the record, whether a jury could reasonably find the plaintiff's factual contentions true by a preponderance of the evidence. *See Anderson*, 477 U.S. at 252–53.

Finally, should the nonmoving party fail to make a sufficient showing on an essential element of its case that it has the burden to prove, the movant will be entitled to summary judgment. *Celotex*, 477 U.S. at 323. The Court construes Rule 56 with due regard not only for the rights of those "asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis." *Id.* at 327.

**DISCUSSION**

6

A. **Choice of Law**

This matter is before the Court on diversity jurisdiction.  (ECF No. 1 at PageID 1.)  A federal district court sitting in diversity applies the substantive laws of the state in which it sits, including the forum state's choice of law rules.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009); *Philadelphia Indem. Ins. Co. v. FedEx Freight, Inc.*, 297 F. Supp. 3d 795, 802 (W.D. Tenn. 2017).  Here, the parties do not dispute that Tennessee is the forum state.

The parties take conflicting positions concerning the application of Tennessee's choice of law rules.  (*Compare* ECF No. 34 at PageID 580, *with* ECF No. 44 at PageID 637.)  Owners argues that the Restatement (Second) of Conflict of Law's "most significant relationship" test applies.  (ECF No. 34 at PageID 581.)  Under this approach, the location of the insured's risk is the preeminent factor for the Court to consider.  (*Id.*); *see also Standard Fire Ins. Co. v. Chester O'Donley & Assocs., Inc.*, 972 S.W.2d 1, 5 n.1 (Tenn. Ct. App. 1998) (explaining that "with specific regard to insurance contracts, the location of the insured risk is given greater weight than any other factor unless the insurance covers a group of risks scattered throughout two or more states").  This approach dictates that Mississippi law controls because the buildings at issue are in Olive Branch, Mississippi.  (ECF No. 34 at PageID 581; ECF No. 48 at PageID 913.)

However, KW argues that Tennessee follows the doctrine of *lex loci contractus* in the insurance coverage context.  (ECF No. 44 at PageID 637.)  Under this approach, the Court would apply the law of the state where the insurance policy was issued unless contradicted by the parties' intent.  (*Id.*); *see also Nationwide Affinity Ins. Co. of Am. v. Richards*, 439 F. Supp. 3d 1026, 1031 (W.D. Tenn. 2020) ("In Tennessee, absent a valid choice of law provision, the rights and obligations under an insurance policy are governed by the law of the state where the insurance

policy was 'made and delivered.'" (citation omitted)).   KW argues Tennessee law applies because

the policies at issue were made and delivered in Tennessee.  (ECF No. 44 at PageID 637.)

KW correctly argues that Tennessee law governs this dispute; a legion of courts in this

Circuit have affirmed this conclusion.  *See Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d

465, 467 (Tenn. 1973) ("The Tennessee conflict of laws rule provides that rights and obligations

under a contract are governed by the law of that state with the view to which it is made. . . .");

*Blackwell v. Sky High Sports Nashville Operations, LLC*, 523 S.W.3d 624, 632 (Tenn. Ct. App.

2017) ("Tennessee follows the rule of *lex loci contractus*."); *Nelson v. Nelson*, 409 S.W.3d 629,

632 (Tenn. Ct. App. 2013) ("Likewise, numerous federal diversity cases have recognized that

Tennessee follows the *lex loci contractus* doctrine in insurance coverage disputes, such that the

substantive law of the state where the insurance policy was issued and delivered will control.");

*Nationwide*, 439 F. Supp. 3d at 1031 ("In Tennessee, absent a valid choice of law provision, the

rights and obligations under an insurance policy are governed by the law of the state where the

insurance policy was 'made and delivered.'"); *Philadelphia Indem. Ins. Co.*, 297 F. Supp. 3d at

802 ("In insurance coverage disputes, Tennessee follows the *lex loci contractus* doctrine[.]").

The Court finds Owners' contrary arguments unpersuasive.  Take first Owners' assertion

that the Restatement (Second) Conflict of Laws applies to this dispute.  Owners relies on *Standard

Fire Ins. Co. v. Chester O'Donley & Assocs.*, 972 S.W.2d 1 (Tenn. Ct. App. 1998) for the

proposition that the location of the insured's risk takes analytical primacy.  (ECF No. 34 at PageID

581.)  While Owners would be correct had this action involved **tort** claims, the reality is that it

does not.  *See Chester O'Donley*, 972 S.W.2d at 5 n.1.  As the *Chester O'Donley* court explained:

> These decisions embody the traditional "lex loci contractu[s]" choice of law theory.
> The Tennessee Supreme Court **abandoned a similar choice of law theory**
> **applicable to tort actions,** "lex loci deliciti," because it was outmoded and

increasingly irrelevant in today's modern industrial world. *See Hataway v. McKinley,* 830 S.W.2d 53, 57 (Tenn. 1992). In its place, the court adopted the "most significant relationship" approach found in Restatement (Second) of Conflict of Laws §§ 6, 145, 146, & 175 (1971).

**The court has yet to adopt the similar approach for contract disputes**, although Restatement (Second) of Conflict of Laws § 188 embodies such an approach when the parties have not effectively chosen the law applicable to their contract. With specific regard to insurance contracts, the location of the insured risk is given greater weight than any other factor unless the insurance covers a group of risks scattered throughout two or more states. *See* Restatement (Second) of Conflict of Laws § 193 cmt. b. Policies insuring multiple risks in two or more specific states may be treated as insuring individual risks in each state. *See* Restatement (Second) of Conflict of Laws § 193 cmt. f.

Were we to apply the approach in Restatement (Second) of Conflict of Laws §§ 6, 186, 187, 188, & 193 to this case we would reach the same result reached using the traditional lex loci contractu[s] rule. Standard Fire's insurance policy covered liability incurred by Chester–O'Donley anywhere in the United States of America. Since it did not identify particular risks in specific states, the location of the insured risk is not of controlling importance. *See Continental Ins. Co. v. Beecham, Inc.,* 836 F.Supp. 1027, 1035–37 (D.N.J. 1993). Notwithstanding the fact that the project was located in Tennessee, Kentucky remains the state with the most significant relationship with this insurance contract after taking into consideration the factors in Restatement (Second) of Contracts §§ 6 & 188(2).

*Id.* (emphasis added). Indeed, the *Chester O'Donley* court applied Kentucky law because the insurance contract at issue had been **made** and **delivered** in Kentucky. *Id.* at 5.

Owners' reliance on *S. Fifth Towers, LLC v. Aspen Ins. UK, Ltd.*, 763 F. App'x 401, 407 (6th Cir. 2019) and *Gov't Employees Ins. Co. v. Bloodworth*, No. M2003-02986-COA-R10-CV, 2007 WL 1966022 (Tenn. Ct. App. June 29, 2007), is equally misplaced. (ECF No. 47 at PageID 903–05.) For instance, the Sixth Circuit in *S. Fifth Towers* applied Kentucky's choice of law rules because **Kentucky was the forum state**. 763 F. App'x at 407.

Further, *Bloodworth* is easily distinguishable from the case at bar. *Bloodworth* involved a class action concerning insurance policies that spanned twenty-four (24) states. 2007 WL 1966022, at *1. Had the *Bloodworth* court applied Tennessee's traditional rule of *lex loci*

*contractus*, the state court would have had to apply twenty-four (24) state laws. *Id.* at \*26. Naturally, such a result could not be sanctioned, and the *Bloodworth* court instead opted for the "most significant relationship" test, explaining that, "[a]lthough the case before us is brought as a breach of contract claim, tort law principles will determine many of the primary issues in the case." 2007 WL 1966022, at \*27. The Court does not face similar issues here.

Simply put, Owners incorrectly argues that Tennessee applies the "most significant relationship" test to insurance coverage disputes. The default rule in Tennessee is that the law of the state where the insurance contract was made and delivered will control. *See Ohio Cas. Ins. Co.*, 493 S.W.2d at 467. It is undisputed that the policies at issue were procured through an insurance agent based in Tennessee. (ECF No. 33-8 at PageID 470.) Further, the insured, KW, is based in Tennessee. (*Id.*) And finally, the premiums are calculated based off properties located in Tennessee. (*Id.* at PageID 471–473.) Therefore, Tennessee law governs.

## B. <u>Owners' Summary Judgment Motion</u>

The Court now turns to the merits of Owners' motion under Tennessee law. This case concerns whether coverage exists under insurance policies issued by Owners. The Court applies the same rules of construction to the insurance policies at issue as it would to any other contract. *Travelers Indem. Co. of Am. v. Moore & Assoc., Inc.*, 216 S.W.3d 302, 305–06 (Tenn. 2007) (citing *McKimm v. Bell*, 790 S.W.2d 526, 527 (Tenn. 1990)). The insurance contract's terms "must be interpreted fairly and reasonably, giving the language its usual and ordinary meaning." *Naifeh v. Valley Forge Life Ins. Co.*, 204 S.W.3d 758, 768 (Tenn. 2006). Any ambiguity in the policy's terms, however, must be construed in the insured's favor. *See Am. Justice Ins. Reciprocal v. Hutchison*, 15 S.W. 3d 811, 815 (Tenn. 2000). The Court aims to "determine the intention of the parties and give effect to that intention." *Naifeh*, 204 S.W. 3d at 768.

Generally, "insurance policies should be construed as a whole in a reasonable and logical manner." *Chester O'Donley*, 972 S.W. 2d at 7. When coverage issues arise, courts should construe insurance policies in the following manner: (1) the declarations; (2) the insuring agreements and definitions; (3) the exclusions; (4) the conditions; and (5) the endorsements. *Id.* "The insuring agreement sets the outer limits of an insurer's contractual liability. If coverage cannot be found in the insuring agreement, it will not be found elsewhere in the policy." *Id.* Exclusion provisions aid the Court because they "help define and shape the scope of coverage, but they must be read in terms of the insuring agreement to which they apply." *Id.*

1. Whether the subcontractor endorsement applies

The Court first turns to the policies' "Subcontractor Caused Property Damage Coverage" endorsement ("Subcontractor endorsement"). "It is well settled that riders or endorsements qualifying or restricting the liability of the insurer attached to the face of the policy contemporaneously with its issuance to the insured, constitute a part of the policy, where such riders or endorsements themselves provide that they are a part of the policy." *Taylor v. State Farm Ins. Co.*, 775 S.W.2d 370, 371 (Tenn. Ct. App. 1989) (quoting *Brown v. Tenn. Auto Ins. Co.*, 237 S.W.2d 553, 555 (Tenn. 1951)); *see also Allmerica Fin. Benefit Ins. Co. v. Eagles Sales Co., Inc.*, No. 2:17-cv-02545, 2021 WL 140810, at *7 (W.D. Tenn. Jan. 14, 2021) (citing *Taylor*, 775 S.W.2d at 371).

The Subcontractor endorsement provides that:

We will pay those sums that the insured becomes legally obligated to pay as damages for "subcontractor caused property damage" to "your work" included in the "products-completed operations hazard".

Such damage shall be deemed:

a. To have been caused by an "occurrence"; and

11

b. Not to have been expected or intended from the standpoint of the insured.

(ECF No. 33-8 at PageID 501.)   In light of the above language, the parties agree that the Subcontractor endorsement requires KW to establish three things: (1) that the property damage to Buildings 27 and 28 qualifies as "subcontractor caused property damage;" (2) that the damage was to "your work;" and (3) that the damage falls within the "products-completed operations hazard" provision.  (ECF No. 34 at PageID 588; ECF No. 44 at PageID 640.)

     *i. "Subcontractor caused property damage" provision*

The policies define "subcontractor caused property damage" as:

a. Physical injury to tangible property caused by your subcontractor, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

b. Loss of use of tangible property that is not physically injured, however, such loss of use must be the result of physical injury to other property arising out of your subcontractor's work.  All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

(*Id.* at PageID 502.)  Owners argues that this provision "necessarily requires the insured to prove that its subcontractor's work was defective."  (ECF No. 34 at PageID 588.)   More specifically, Owners asserts that KW has failed to establish this element because it cannot pinpoint exactly which subcontractor caused the damage or how.  (*Id.* at PageID 588–89.)

The Court disagrees and finds that a genuine issue of fact exists that precludes judgment in Owners' favor on this issue.  Given that KW entrusted all the earthwork to its subcontractors, a jury could reasonably infer that one of the subcontractors caused the damage to the buildings.  This

possible inference finds some traction in the undisputed fact that KW did not perform any actual construction work on the project.[6]  (ECF No. 48 at PageID 913.)

While true that the firm Owners hired to investigate KW's insurance claim, GHD, and another third-party firm identified issues with the soil conditions because of an earlier mining operation at the project site,  this finding is not dispositive as to whether a KW subcontractor caused the property damage.  (ECF No. 34 at PageID 578–79; ECF No. 44 at PageID 635–36.) This conclusion may also be drawn from the GHD report, which suggests that the issue could have been discovered had proper steps been taken.  (ECF No. 33-10 at PageID 520–21.)  One natural inference from this suggestion could be that one of KW's subcontractors performed inadequately. Therefore, a genuine dispute of material fact exists that precludes summary judgment on this issue. *See Travelers Indem. Co.*, 216 S.W.3d at 305; *GEICO Gen. Ins. Co. v. Howard*, 928 S.W.2d 443, 445 (Tenn. Ct. App. 1996) ("Where there is a dispute as to any material fact, *or doubt as to the conclusions to be drawn from that fact*, a motion for summary judgment is not appropriate.") (emphasis added).

---

6. Owners asserts that the Court should disregard the affidavit of Chris Acuff because it is "self-serving" and contradicts prior testimony and evidence in the record.  (ECF No. 47 at PageID 908 n. 9.)  This argument is not well-taken.  First, to the extent that Mr. Acuff's testimony conflicts with evidence in the record, the Court cannot resolve that conflict on summary judgment.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).  Second, Mr. Acuff's affidavit testimony does not contradict his prior deposition testimony.  (ECF No. 47 at PageID 908 n. 9.) Mr. Acuff, when testifying as a Rule 30(b)(b) witness for KW, testified that "[KW] didn't know what caused [the differential settlement]."  (ECF No. 44-6 at PageID 771.)  Although he also testified that he had no reason to believe that the subcontractors did not do their work properly, Mr. Acuff also stated that "I can't say whether or not that— they didn't do their work properly." (ECF No. 33-7 at PageID 461.)  Moreover, the question posed by Owners to Mr. Acuff explicitly stated that it was not asking for Mr. Acuff to render an "expert opinion" as to what caused the differential settlement.  (*Id.* at PageID 460.)  Finally, the mere fact that an affidavit is "self-serving" does not undercut its probative value.  *See Boykin v. Family Dollar Stores of Mich., LLC*, 3 F.4th 832, 841 (6th Cir. 2021) (cautioning courts and parties to avoid using the "'self-serving' label because it does nothing to undermine the other side's evidence under Rule 56").

        ii.      *"Your work" provision*

Owners does not contest this provision and the Court need not address it in detail.  (ECF No. 34 at PageID 588.)  The Court briefly notes that "your work" is defined as "work or operations performed by you or on your behalf."  (ECF No. 33-8 at PageID 500.)  The work performed by the subcontractors on behalf of KW clearly falls within this definition's plain meaning.  (*Id.*)

        iii.     *"Products-completed operations hazard" provision*

The policies define "products-completed operations hazard" ("PCOH") as "all 'bodily injury' and 'property damage' occurring away from premises you own or rent and arising out of 'your product' or 'your work.'"  (ECF No. 33-8 at PageID 499.)  Generally, these provisions pertain to "work performed on the premises of others by contractors and subcontractors." *Am. Red Cross v. Travelers Indem. Co. of Rhode Island*, 816 F. Supp. 755, 760 (D.D.C. 1993); *Pacific Indem. Co. v. Linn*, 766 F.2d 754, 764 (3d Cir. 1985) ("Under Pennsylvania law, this clause is intended to cover businesses that perform contracts at premises other than their own."); *Gen. Ins. Co. of Am. v. Crawford*, 635 S.W.2d 98, 102–03 (Tenn. 1982) (involving a similar PCOH provision and explaining that "[i]t appears to be designed primarily for businesses that perform services or maintenance, such as contractors or subcontractors").

    Owners argues that the property damage to Buildings 27 and 28 fails to qualify as PCOH because KW owned the land on which the buildings sat.  (ECF No. 34 at PageID 589.)  In other words, the property damage does not fall under the definition of PCOH because it did not occur away from the premises.  (*Id.*)  KW responds that its purported ownership of the land is irrelevant because it did not own the buildings at issue.  (ECF No. 44 at PageID 642.)  As KW argues, "the damage that is the subject of the Claim is to the Buildings, not the dirt beneath them."  (*Id.*)

Accordingly, at issue is whether the property damage occurred "**_away_** from premises" that KW either owns or rents.  (ECF No. 33-8 at PageID 499.)   Notably, Owners admits that KW does not own the buildings or the units that comprise them.  (ECF No. 34 at PageID 589; ECF No. 48 at PageID 919.)  Given this admission, KW's purported ownership of the land would not resolve the issue.[7]  Different interpretations of the phrase "away from premises" could render different results on whether coverage exists.  The Court, mindful of this ambiguity, construes the language in the insured's favor.  _See Am. Justice Ins. Reciprocal v. Hutchison_, 15 S.W.3d 811, 815 (Tenn. 2000).  Therefore, the Court **DENIES** Owners' Motion as to this issue and finds that the alleged property damage arguably falls within the Subcontractor Endorsement.

2.  Whether the damage qualifies as an "occurrence"

Owners correctly argues that coverage only exists for damages caused by an "occurrence." (ECF No. 34 at PageID 583.)   However, because the Court finds that the Subcontractor Endorsement applies, Owners incorrectly argues that the damage here does not qualify as an occurrence. (_Id._ at PageID 586.)  Under the Subcontractor Endorsement, property damage caused by the work of a subcontractor will be deemed "to have been caused by an occurrence."  (ECF No. 33-8 at PageID 501); _see also Taylor_, 775 S.W.2d at 371 ("The rider or endorsement, insofar as it qualifies, modifies or restricts the terms of the policy is controlling.").   Thus, the Court **DENIES** Owners' Motion as to this issue.

3.  Exclusion provisions

Owners asserts that, even if KW's claims triggers coverage, several exclusions apply. (ECF No. 34 at PageID 589–90.)  Owners relies on the following exclusion provisions: (1) the "expected or intended injury" exclusion; (2) the "your work" or "damages to property" exclusion;

_____

7.  KW disputes Owners' assertion that it owns the land.  (ECF No. 44 at PageID 642.)

(3) the "impaired property" exclusion; and (4) the "damage to property" exclusion.  The Court will address each of these provisions in turn.

> i.   _The "expected or intended injury" provision_

The policies contain an exclusion related to expected or intended injury that states coverage does not extend to "'[b]odily injury' or 'property damage' expected or intended from the standpoint of the insured."  (ECF No. 33-8 at PageID 484.)  The Subcontractor Endorsement, however, provides that subcontractor caused damage "shall be deemed not to have been expected or intended from the standpoint of the insured."  (_Id._ at PageID 501.)  This exclusion provision does not apply because the Court has found that the Subcontractor Endorsement controls.  _See Taylor_, 775 S.W.2d at 371.  Therefore, the Court **DENIES** Owners' Motion on this issue.

> ii.   _The "your work" or "damages to property" exclusion_

The policies exclude coverage for property damage that "must be restored, repaired or replaced because 'your work' was incorrectly performed on it."  (ECF No. 33-8 at PageID 487.)  They also state that "this exclusion does not apply to 'property damage' included in the 'products completed operations hazard.'"  (_Id._)

Owners argues that this exclusion applies because the relevant "work"— KW's development of the condominiums—was ineptly performed.   (ECF No. 34 at PageID 591.)  KW counters that the exclusion provision exempts damages included within the PCOH provision.  (ECF No. 44 at PageID 644–45.)   As part of the Court's finding that the Subcontractor Endorsement applied, the Court determined that the damage to the buildings arguably fell within the PCOH provision.  Therefore, the Court **DENIES** Owners' Motion as to this issue because the exclusion exempts any property damage that qualifies as PCOH.

> iii.   _The "impaired property" exclusion_

The policies include a provision that excludes coverage for property damage to impaired property.  (ECF No. 33-8 at PageID 487.)  The exclusion provides that:

> **Damage To Impaired Property Or Property Not Physically Injured**
> "Property damage" to "impaired property" or property that has not been physically injured, arising out of:
>
> (1) A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
> (2) A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.
>
> This exclusion does not apply to the loss of use of other property arising out of sudden and accidental physical injury to "your product" or "your work" after it has been put to its intended use.

(*Id.* at PageID 487.)  The policies define "impaired property" as:

> [T]angible property, other than "your product" or "your work", that cannot be used or is less useful because:
>
> a. It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or
> b. You have failed to fulfill the terms of a contract or agreement
>
> if such property can be restored to use by:
>
> a. The repair, replacement, adjustment or removal of "your product" or "your work"; or
> b. Your fulfilling the terms of the contract or agreement.

 (*Id.* at PageID 497.)   At the outset, the Court notes that this exclusion provision is not a paragon of clarity.  Indeed, commentators have remarked that the exclusion is "too complex to receive a uniform interpretation," "tricky," and "unintelligible or at least ineffective to overcome the insured's reasonable expectations of coverage."  *Black v. Veatch Corp. v. Aspen Ins. (UK) Ltd.*, 378 F. Supp. 3d 975, 999 (D. Kan. 2019) (quoting 4 Pt. 2 Philip L. Bruner and Patrick J. O'Connor, Jr., *Bruner and O'Connor on Construction Law* § 11:264 (2018))

Upon reviewing the pertinent provisions, the Court finds that Owners has failed to show that the exclusion applies.  *See Chester O'Donley*, 972 S.W. at 8.  Owners asserts that this exclusion applies because the damage to the buildings arose from KW's work.  (ECF No. 34 at PageID 591; ECF No. 47 at PageID 906.)  This assertion alone does not trigger the provision.

Returning to the text: "impaired property" is tangible property that "incorporates" KW's work or product that "can be restored to use by the repair, replacement, adjustment or removal of 'your product' or 'your work.'" (ECF No. 33-8 at PageID 497.)   Here, there is no assertion that the damage to the buildings could be "restored to use by the repair, replacement, adjustment, or removal of" KW's work.  *See Federated Mut. Ins. Co. v. Grapevine Excavation Inc.*, 197 F.3d 720, 728 (5th Cir. 1999) ("Similarly here, there has been no suggestion that the damage to the surface of the parking lot can be restored by 'the repair, replacement, adjustment or removal of' GEI's underlying work.").   Therefore, the Court **DENIES** Owners' Motion as to this issue.

    *iv.*   *The "damage to property" exclusion*

Finally, Owners contends that the "Damage to Property" provision excludes coverage. (ECF No. 34 at PageID 592.)  The "Damage to Property" provision excludes property damage for:

> (1) Property you own, rent, occupy or use, including any cost or expense incurred by you, or any other person, organization or entity, for repair, replacement, enhancement, restoration or maintenance of such property for any reason, including prevention of injury to a person or damage to another's property;
>
> . . .
>
> (3) Premises you sell, give away or abandon, if the "property damage" arises out of any part of those premises;

(ECF No. 33-8 at PageID 487.)  Concerning subsection (3), the policies also provide that "this exclusion does not apply if the premises are 'your work' and were never occupied, rented or held for rental by you."  (*Id.*)

Neither provision Owners cites applies.  First, subsection (1) does not apply because KW did not own the buildings at issue when the damage occurred.  Subsection (1) only applies to property owned, rented, occupied, or used by KW.  It is undisputed that KW did not own the buildings or the units inside them when they were damaged.  (ECF No. 48 at PageID 919.)

Turning to subsection (3), the Court finds this provision equally inapplicable.  The policies curb the scope of subsection (3) by providing that it "does not apply if the premises are 'your work' and were never occupied, rented or held for rental by you."  (ECF No. 33-8 at PageID 487.) Nothing in the Record suggests that KW held the property open for rent or occupied it.  Without more, the Court finds that subsection (3) does not apply.  Therefore, the Court **DENIES** Owners' Motion as to this issue.

4.  <u>Owners' potential liability</u>

The Court now turns to the final issue raised by Owners' motion: its potential liability under the policies.  Should coverage exist (and no exclusion apply), Owners argues that its liability is limited to just $1 million dollars because the damage to the buildings counts as a single occurrence.  (ECF No. 34 at PageID 593.)  KW argues there could be as many as (8) different occurrences under the policies since each building had four (4) units.  (ECF No. 44 at PageID 648.)

Before turning to that question, the Court first addresses a threshold disagreement between the parties on whether multiple policies are at issue.  Owners argues that there is just one policy; put simply, the 2016 policy is merely a renewal of the 2015 policy.  (ECF No. 34 at PageID 592– 93.)  KW asserts these are distinct, but overlapping, policies.  (ECF No. 44 at PageID 448–49.)

The Court finds that there is only one operative policy at play here: the 2016 policy. "Whether a renewal insurance policy is a new and independent contract or whether it is an extension or continuation of the original contract depends primarily upon the intention of the

parties as ascertained from the instrument itself." *Tenn. Clutch & Supply, Inc. v. Auto-Owners (Mut.) Ins. Co.*, 556 S.W.3d 203, 208 (Tenn. Ct. App. 2017). Here, three indicators suggest that the 2016 policy renewed the 2015 policy. First, the 2016 policy denotes October 1, 2016 as the "renewal effective" date. (ECF No. 33-8 at PageID 470); *see also Tenn. Clutch & Supply, Inc. v. Auto-Owners (Mut.) Ins. Co.*, 556 S.W.3d 203, 208 (Tenn. Ct. App. 2017); *Gieringer v. Cincinnati Ins. Co.*, No. 3:08-cv-267, 2010 WL 1050201, at *4 (E.D. Tenn. Mar. 22, 2010). Second, the policies feature identical numbering notwithstanding a minor reference to the year each was issued. (ECF No. 45 at PageID 888); *see also Gieringer*, 2010 WL 1050201, at *4. Third, the policies share nearly identical language. (ECF No. 44 at PageID 641 n.15); *see also Gieringer*, 2010 WL 1050201, at *4. Moreover, in addition to these indicators, several other references allude to the fact that the 2016 policy effectively renewed the 2015 policy. (ECF No. 44 at PageID 688 and 691). Therefore, the Court recognizes the 2016 policy as the only operative policy.

Having identified only one operative policy, the Court next addresses Owners' argument that its potential liability is capped at $1 million dollars. The Court disagrees and finds that Owners' maximum potential liability is $2 million dollars because at least two (2) "occurrences" happened. In a similar case, *Kuhn's of Brownsville v. Bituminous Cas. Co.*, 270 S.W.2d 358 (Tenn. 1954), the Tennessee Supreme Court found that the destruction of two buildings on different dates because of one negligent excavation constituted two occurrences. *Id.* at 360; *see also Brooks v. Memphis & Shelby Cty. Hosp. Auth.*, 717 S.W.2d 292, 297 (Tenn. Ct. App. 1986) (explaining that the number of occurrences is calculated "from the point of view of the persons injured rather than from the point of view of the proximate cause of the accident"). Similarly, it appears from the record that the damage to Buildings 27 and 28 arose over time but derived from a single source. (ECF No. 44-16 at PageID 862); *see also Sears, Roebuck & Co. v. Light*, No. 2:13-cv-02600-JTF-

tmp, 2014 WL 12531101, at *3 (W.D. Tenn. Dec. 9, 2014) (holding that only one occurrence happened because "Plaintiffs have only alleged one negligent act by one party affecting one distribution center on a single date").  At minimum, there are two occurrences here because the damage arose with two different buildings.  Therefore, the Court finds at least two occurrences.

KW's argument that there might be eight (8) occurrences is not well-taken because it would not change Owners' potential liability.  (ECF No. 44 at PageID 648.)  The 2016 policy obligates Owners to pay "those sums" related to bodily injury or property damage caused by "an occurrence." (ECF No. 33-8 at PageID 483.)  The 2016 policy provides that Owners will cover up to $1 million dollars for each occurrence.  (*Id.* at PageID 471.) That provision does not mean Owners' potential liability—as KW suggests— is $1 million for each and every occurrence because the 2016 policy also provides that the "General Aggregate Limit" is the most Owners will pay.  (*Id.* at PageID 493.)  The "General Aggregate Limit" is $2 million dollars.  (*Id.* at PageID 471.)   Even if the Court accepts KW's premise that there could be up to eight (8) occurrences, that finding would not increase Owners' liability.  Based on the terms of the 2016 policy, Owners' maximum liability for the damages alleged here is $2 million dollars.  The Court finds there are at least two "occurrences" under the 2016 policy and Owners' potential liability is capped at $2 million dollars per the 2016 policy.  Therefore, the Court **DENIES** Owners' Motion on this issue.

## CONCLUSION

For the foregoing reasons, the Court **DENIES** Owners' Motion.  (ECF No. 33.)  Consistent with the parties' desire to proceed under a two-phase discovery process, the parties are hereby **ORDERED** to meet and confer and submit to the Court within twenty-one (21) days of entry of this Order a proposed-agreed-upon scheduling order setting the pertinent dates for discovery on KW's counterclaims.  (ECF No. 22 at PageID 250.)

**IT IS SO ORDERED**, this the 28th day of March, 2022.

*s/ Mark Norris*
MARK S. NORRIS
UNITED STATES DISTRICT JUDGE